57 F.3d 1067
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Cathryn WEBB, Plaintiff-Appellant,
v.
BAXTER HEALTHCARE CORPORATION, Defendant-Appellee.
 No. 94-1784.
 United States Court of Appeals, Fourth Circuit.
 Argued: January 30, 1995.
Decided: June 13, 1995.
 
 ARGUED: John Michael Bredehoft, Charlson & Bredehoft, P.C., Fairfax, VA, for Appellant. Jana Howard Carey, Venable, Baetjer & Howard, Baltimore, MD, for Appellee. ON BRIEF: Elaine C. Bredehoft, Linda G. Hill, Charlson & Bredehoft, P.C., Fairfax, VA, for Appellant. Todd J. Horn, Michael W. Robinson, Venable, Baetjer & Howard, Baltimore, MD, for Appellee.
 Before HALL and HAMILTON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Cathryn Webb appeals an order of the district court granting summary judgment for Baxter Healthcare Corporation in Webb's action asserting employment discrimination on the basis of gender, religion, and disability, and common-law claims of wrongful discharge and intentional infliction of emotional distress. We affirm the judgment except as to Webb's claim that she was subjected to a hostile workplace on account of her gender.
 
 I.
 
 2
 Webb was hired as a sales representative by Baxter Healthcare in July, 1991. The District of Columbia area was her territory. She was the first woman hired as a sales representative in the region, and her boss was regional manager Howard Harris. On July 23, Harris sent a memorandum to all of his sales representatives announcing Webb's hiring. In it, he referred to her as a "beauty" who was joining his "Beasts in the East." Within a few weeks, Harris sent a gift to his employees, including Webb--a T-Shirt from an Ocean City bar called "Big Pecker's."[1] Similarly, in a voice mail message, he referred to the representatives as "all you swinging dicks." According to Webb, she was subjected to other incidents of gender-based ridicule and humiliation. Harris once became unduly angry at her for changing the time of a meeting with a client. Webb complained to Harris' supervisor, Jeffrey Comer. Harris found out, and, that evening, he called Webb and began another angry barrage. Webb started to cry, which prompted Harris to remark, "Why can't you just take it like a man?" On other occasions, Harris referred to her as "Little Cathy" or "Sybil" (after a movie character with multiple personalities).[2] Once, when she was wearing a pink suit for meetings at Washington Hospital Center and Walter Reed, Harris chastised her, "What kind of get-up is that? That suit's really loud and obnoxious." He followed up this criticism with comments about Webb's attire on her voice mail for a couple of weeks.
 
 
 3
 A fellow employee, Rick Peiffer, opined to Webb, "Women shouldn't work. They should stay at home and have kids." Webb reported these remarks to Harris, who responded, "You're the only girl in 'Boystown' and you'll just have to take it." On one occasion in December, 1991, Webb contends that she was sent on an overnight trip to Baltimore because a scheduled early-morning angioscope delivery there interfered with Harris and Peiffer's plan for a late night out at a Washington topless bar. When Webb voiced her dismay at being inconvenienced by Harris' pursuit of that genre of recreation, Harris was unmoved. He boasted, "I'm on a first name basis with all the dancers in that bar."
 
 
 4
 Webb also complains that her performance was more closely critiqued than her male colleagues', though Baxter responds that her sales were in fact low. Finally, Webb alleges that Harris neglected to process her expenses in as timely a manner as male employees'.
 
 
 5
 Though the incidents are fewer and more isolated, Webb also asserts that Harris discriminated against her because she is Jewish. He denied her time off for Passover and Yom Kippur, inasmuch as those holidays were not "important," and he said things like "You Jews are all alike" and "I don't know what's wrong with you Jews."
 
 
 6
 In August, 1992, Webb contacted Tom Tillotson, Baxter's vicepresident for human resources, to complain about Harris' conduct. Webb and Tillotson met on August 13, and Webb detailed her allegations. Tillotson began to investigate, but took no disciplinary action against Harris. In December, with her emotional state deteriorating, Webb took a medical leave of absence.
 
 
 7
 On December 17, 1992, Tillotson referred Webb to Baxter's employee assistance program, which in turn sent her to Arbit, Inc., a private employee assistance agency. On February 9, 1993, Patricia Nyhus of Arbit wrote a letter to Baxter on Webb's behalf. The letter detailed Harris' behavior toward Webb and noted that it had forced Webb to seek counseling.
 
 
 8
 Meanwhile, in a letter dated February 4, Harris reprimanded Webb for a "pattern of tardiness" and inappropriate behavior with clients. In a rebutting letter dated February 13, Webb slung mud at Harris. Harris sent Tillotson a voice mail message on February 20 in which he opined that Webb "is very much off her rocker" and that "one of us is leaving [Baxter] for sure."
 
 
 9
 Tillotson continued to investigate. He spoke to Comer, who described Harris as "dependable," and who found it "hard to believe" that Harris had harassed Webb. On the other hand, though Harris had denied calling Webb a "little girl" on voice mail messages, Comer thought that it "sounds like Howie." On February 22, Tillotson asked Julie Isaacs, a Baxter employee in charge of processing expense reports, where Webb's reports were. Isaacs responded, "Howie's holding them."
 
 
 10
 Webb had returned from medical leave on January 3, 1993, but on February 24, she left work again. On March 4, Webb met with Tillotson. She gave him a list of witnesses and a chronology of the harassment she perceived. Tillotson met with Harris eight days later. Harris prepared a written rebuttal, and he recommended immediate termination of Webb. Tillotson did not follow this recommendation.
 
 
 11
 Over the next couple of weeks, Tillotson gathered more information, though Webb complains that he did not contact everyone on her witness list. On March 29, Tillotson informed Webb and Harris that the investigation was complete, and there was insufficient evidence of a violation of law or Baxter policy. In identical language, Webb and Harris were told:
 
 
 12
 The charges of harassment are serious and one which the organization will not tolerate. Your cooperation in this process is appreciated and your productive return to an ongoing work relationship is expected.
 
 
 13
 Tillotson also advised Harris orally that he felt Harris had used poor judgment in giving Webb the "Big Pecker's" T-shirt. In the course of the investigation, Harris had also admitted referring to his employees as "swinging dicks," and was advised that the remark was inappropriate.
 
 
 14
 Meanwhile, Webb was being treated for her emotional problems. Dr. Kathryn Ford examined her on April 4, and diagnosed "major depression, single episode, severe, without psychotic features. Some features of post traumatic stress disorder were observed ... including a fear of being fired." Dr. Ford noted that Webb was taking several different prescription drugs for depression, sleeplessness, and thyroid problems. On April 6, Baxter approved medical leave through May 3, and Webb was called at home and so informed.
 
 
 15
 On April 30, Webb went to Springwood Psychiatric Institute. She was in an obviously disordered state. She had been abusing her prescription drugs, and was admitted with two primary diagnoses: depression and polysubstance abuse.
 
 
 16
 The May 3 return-to-work date passed. Tillotson wrote Webb at her home on May 5 to warn her that she had not provided adequate information to extend her leave of absence. On May 11, Tillotson wrote again, informing Webb that her failure to return to work required Baxter to assume that she had voluntarily resigned. Webb was at Springfield when these letters were sent.
 
 
 17
 Webb asserts that her doctor notified Baxter by facsimile of her condition, and Baxter could not have expected her to call in personally and explain her absence. Though a reasonable trier of fact could find that this facsimile was received at Baxter headquarters, it is undisputed in this record that none of the persons involved in the decision to terminate Webb saw it before her termination.[3]
 
 
 18
 Moreover, Webb was not exactly incoherent during her hospital stay. She had arranged for her housekeeping. On May 4, Dr. Hien Tran, who treated Webb at Springfield, made a note that Webb had received several phone calls and wished to be moved to an open unit the next day. On May 12, a day before she was discharged, Webb visited her home on a therapeutic pass because she was worried about her pet cat's imminent labor. But at no time did she notify Harris or Tillotson of her whereabouts or request an extension of her expired leave.
 
 
 19
 Later that summer, Webb requested her job back, but was turned down. Baxter reorganized, and her job was never filled.
 
 
 20
 Webb filed a charge with the Equal Employment Opportunity Commission, received a right-to-sue letter, and then filed this suit in district court. After extensive discovery, Baxter moved for summary judgment, which the district court granted from the bench.
 
 
 21
 Webb appeals.
 
 II.
 
 22
 Though the parties have generated a mountain of paper and a heap of arguments, much of their effort is beside the point. For example, Baxter wastes space in its brief and consumes nearly an entire volume of the five-volume joint appendix documenting Webb's "performance problems," though it concedes that she was not fired for poor performance or called a "swinging dick" on that account. For her part, Webb takes pains to show us that Harris abuses alcohol. Having a drunk for a boss is not a Title VII claim. The parties' collateral sniping obscures the real issues and makes the work of the courts more difficult.
 
 
 23
 Summary judgment should be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We must view the evidence in the light most favorable to the nonmoving party, and we should draw all reasonable inferences in that party's favor as well. Id. at 255. We review the district court's decision de novo. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.), cert. denied, 115 S.Ct. 67 (1994).
 
 
 24
 The district court devoted nearly all of its brief bench ruling to the circumstances surrounding Webb's termination. The court was quite right that there is no evidence that the people involved in firing Webb had any discriminatory animus toward her. She simply overstayed her medical leave. Even if we assume that she could make a prima facie case of gender, religious, or disability discrimination, she would have to show that Baxter's reason for terminating her was a mere pretext.
 
 
 25
 Baxter provided testimony from those involved in deciding to treat Webb as a voluntary quit.[4] Each stated that, when the decision was made, he or she was ignorant of Webb's religion, her medical condition, and any explanation for her failure to return to work as scheduled. Baxter has no duty to hold a position open for an employee who inexplicably does not show up. Attendance is a basic requirement of most jobs, Tyndall v. National Education Centers, 31 F.3d 209, 213 (4th Cir.1994), and certainly of Webb's job.
 
 
 26
 Harris may have wished to see Webb fired for a discriminatory or retaliatory reason, and some person or persons unknown at Baxter may have had some inkling of her hospital stay. These "facts" are not material to the discriminatory termination issue. The record is clear and undisputed that the decisionmakers had no such motive or knowledge, and their motives and knowledge are the issue. Ambush v. Montgomery County Gov't Dep't of Finance Div'n of Revenue, 620 F.2d 1048, 1054-1055 (4th Cir.1980).
 
 III.
 
 27
 Notwithstanding the propriety of her dismissal, the treatment Webb received while employed at Baxter can still violate Title VII.[5] It is important to keep terminology straight here. This case does not involve "sexual harassment"--Webb does not assert that Harris made unwelcome sexual advances--but rather gender discrimination--Webb argues that Harris made her work life miserable because she is a woman. Many or most hostile workplace cases involve prurient "sexual harassment," but such harassment is not required to make out a case.
 
 
 28
 When the workplace is permeated with "discriminatory intimidation, ridicule, and insult" ... that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" ... Title VII is violated.... Title VII comes into play before the harassing conduct leads to a nervous breakdown. Harris v. Forklift Systems, 114 S.Ct. 367, 370 (1993) (quoting Meritor Savings Bank v. Vinson, 477 U.S. 57, 65 (1986)).
 
 
 29
 Harris identifies four factors to guide courts in deciding whether a meritorious "hostile workplace" claim has been pled or proved: (1) the frequency of the discriminatory conduct; (2) its severity; (3) its character (whether it was physically threatening or humiliating, or merely an offensive utterance); and (4) its effect (whether it would unreasonably interfere with the employee's work performance). Harris, 114 S.Ct. at 371. The plaintiff must prove her case both objectively and subjectively; standing alone, a thin skin cannot create a case, but a thick skin may defeat one. Paroline v. Unisys Corp., 879 F.2d 100, 105 (4th Cir.1989), vacated in part on other grounds, 900 F.2d 27 (4th Cir.1990) (en banc). Because of the wide array of conceivable factual scenarios, this standard is, but must necessarily be, maddeningly imprecise. Harris, 114 S.Ct. at 372 (Scalia, J. concurring) (standard leaves juries "virtually unguided," but there is "no alternative"). Applying it on a motion for summary judgment is especially difficult, inasmuch as whether " 'harassment is sufficiently severe or pervasive is quintessentially a question of fact.' " Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir.1994) (quoting Paroline, 879 F.2d at 105).
 
 
 30
 The district court had precious little to say about Webb's hostile workplace claims:
 
 
 31
 [W]hat we have got here is, I think, the classic, not so much hostile work environment, as perhaps obnoxious work environment. I don't think there is any question from this record that Mr. Harris would not be a pleasant supervisor. He's got a true locker-room sense of humor. It was not in good taste. Those are all significant problems in the workplace that are properly addressed by progressive personnel and aggressive personnel actions.
 
 
 32
 This passage sounds more like a finding of fact than a ruling that a reasonable jury could make only one finding of fact. Some of Harris' conduct was of the "locker-room" sort, but a reasonable jury could find that he also ridiculed and demeaned Webb on account of her gender, e.g., "take it like a man" when he had reduced her to tears. Some thing drove this woman into drug abuse and deep depression, and a jury could reasonably find that it was something on the job. Whether the cause was hostility towards her on account of her gender or just nondiscriminatory job stress is, we think, a jury question as well. Finally, we believe that a jury could find that Tillotson's oral reprimand of Harris, combined with a written finding of "no violation" of company policy, was not "prompt and adequate remedial action" sufficient to absolve Baxter of liability. See Swentek v. USAir, Inc., 830 F.2d 552, 558 (4th Cir.1987).
 
 
 33
 We do agree with Baxter that there is insufficient evidence of a hostile workplace motivated by discrimination on the basis of religion or disability. As for the disability claim, evidence is non-existent.[6] The religion claim is better. Webb asserts that she was denied an afternoon off to prepare for Passover because Harris thought the holiday unimportant, and that he occasionally said things like "You Jews are all alike." These incidents, though uncouth, are not severe or pervasive enough to fairly support a finding of a hostile work environment.[7]
 
 IV.
 
 34
 Webb also pled common-law claims of wrongful discharge and intentional infliction of emotional distress. Virginia has recognized a wrongful discharge cause of action that in this context is simply coextensive with Title VII. Lockhart v. Commonwealth Education Systems Corp., 247 Va. 98, 439 S.E.2d 328 (1994); see Va.Code Sec. 2.1-716 (1987 & Supp.1994) (declaring violations of federal and state laws prohibiting discrimination to be "unlawful employment practices"). Webb's discharge violates neither Title VII nor Virginia common law.
 
 
 35
 Intentional infliction of emotional distress requires extreme or outrageous conduct intended to cause and in fact causing severe emotional distress. "Extreme" means just that--only the most execrable conduct can give rise to the tort:
 
 
 36
 "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."
 
 
 37
 Russo v. White, 241 Va. 23, 400 S.E.2d 160, 162 (1991) (quoting Restatement (Second) of Torts Sec. 46, comment d).
 
 
 38
 The conduct alleged here falls short of this standard. Harris' conduct may violate contemporary standards of appropriate behavior in the workplace, but we cannot label it an atrocity or "utterly intolerable in a civilized society."
 
 
 39
 The summary judgment for Baxter on Webb's Title VII gender discrimination claim, insofar as it alleges that she was subjected to a hostile workplace, is reversed, and the case is remanded for further proceedings. In all other respects, the judgment is affirmed.
 
 
 40
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
 
 
 41
 BUTZNER, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 42
 I concur in the court's opinion except for one issue--discrimination because of religion. The district court's summary denial of Webb's timely claim on this issue should be reversed.
 
 
 43
 Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 114 S.Ct. 367, 370 (1993) (internal quotation marks and citations omitted). The proof must show that a reasonable person could find the work environment hostile or abusive and that the victim subjectively perceived hostility and abuse. Id. Title VII also requires employers to make reasonable accommodation for the religious observances of its employees if this can be done without undue hardship on the business. 42 U.S.C. Secs. 2000e-2(a)(1), 2000e(j); Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 71-75 (1977). Tested by these standards, Webb's evidence survives summary judgment.
 
 
 44
 Simply being required to work on a religious holiday is not in itself discriminatory. But to be told--as Webb allegedly was in April 1992--that one cannot take time off to prepare for Passover because Passover is not important adds a discriminatory dimension to the work environment. A boss who demeans an employee's religious holiday in this manner exhibits hostility bred by deeply rooted anti-Semitism. Such conduct is abusive because it ridicules and belittles a victim's religious faith.
 
 
 45
 Webb was also denied time off for Yom Kippur in October 1992 and Passover in April 1993. For the purpose of summary judgment, one can draw the reasonable inference that denial on these occasions was based on her boss's stated reason that these religious holidays are not important.
 
 
 46
 Statements such as "You Jews are all alike" and "I don't know what's wrong with you Jews" are additional evidence of a work environment that is permeated with anti-Semitic discrimination.
 
 
 47
 A reasonable person might well perceive such a work environment to be hostile and abusive. Because Webb is entitled to have a jury assess her evidence in accordance with the standard prescribed by Harris, 114 S.Ct. at 370, and Trans World Airlines, 432 U.S. at 75, I respectfully dissent.
 
 
 
 [1]
 This shirt has a cartoon of a rooster and the bar's address, and it is obvious at a glance that the bar's name is a crude double entendre. Webb's brief does not place the shirt's slogan in this context; indeed, she refers to it as simply "Big Pecker" rather than "Big Pecker's Bar & Grill."
 
 
 [2]
 In a last-minute "Declaration," Webb remembered having been called "bitch," "dear," and "slut." Ordinarily, a party may not use an affidavit to contradict deposition testimony and thereby avoid summary judgment. Barwick v. Celotex Corp., 736 F.2d 946 (4th Cir.1984). Though she did not testify anywhere that she was not called these particular names, she was certainly given ample opportunity (in her EEOC charge, answers to interrogatories, and four days of deposition) to remember any incidents on which she relied. We therefore apply Barwick and do not consider these belated allegations
 
 
 [3]
 Webb's treating physician, Dr. Michael Trahos, found a letter he had written on April 29, 1993, in Webb's file. A notation at the top shows that it was sent somewhere by facsimile on that date at 3:09 p.m. In the same file, but not attached to the letter, were two facsimile transmission confirmations, one for 3:09 p.m. and the other for 3:11 p.m. on April 29, 1993. The 3:11 confirmation shows delivery to Baxter's central facsimile number at its headquarters in California
 The letter itself is quite uninformative. It is addressed "To Whom It May Concern," and its fails to mention Harris, Tillotson, or even Baxter. In full, the letter reads:
 Cathy Webb has been reevaluated on 4-29-94[sic]. Patient has been found to still be suffering from the same medical conditions which causeher [sic] to go off-work.
 This condition has also worsened. Pt. [sic] is therefore recommended that patient continue to remain off work until further notice.
 Also, she has been advised not to engage in activites [sic] or contacts which cause an increase in anxiety and stress.
 Moreover, because it was written a day before Webb went to Springfield, this letter gave Baxter no notice that Webb was not or would not be at home during her convalescence.
 
 
 [4]
 The four management personnel involved were Tillotson, Kathryn Tunstall (president of the Baxter division in which Webb was employed), Timothy Schoenberg (vice-president of sales and marketing), and John Costello (vice-president of sales for the critical care and interventional cardiology division)
 
 
 [5]
 Baxter urges, as an alternative basis to affirm the judgment on the hostile workplace claims, that Webb's EEOC charge was untimely as to them. We disagree, at least as to the gender claim. The affidavit submitted by Webb with her May 21, 1993, charge--filed with the EEOC and the analogous California state agency--asserts that "[t]hroughout [her] entire employment [she] ha[s] been subjected to a sexually hostile work environment." In a later amended charge, a "continuing action" box on the EEOC form was checked, and the EEOC issued a right to sue letter on that amended charge
 So long as a continuing violation--as opposed to a continuing effect of a time-barred violation--is alleged to have extended into the filing period, an EEOC charge is timely. United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977). Moreover, evidence of acts occurring outside of that period may serve as relevant background evidence. Id.
 Because Webb sought relief through a state agency, the relevant period here began 300 days prior to May 21, 1993, that is, July 26, 1992. 42 U.S.C. Sec. 2000e-5(e)(1). Though many of the incidents of which she complains occurred before this date, Webb alleges several that are well within the filing period--e.g. Harris made the "swinging dicks" comment in October, 1992, called her "little Cathy" in November, 1992, and held her expense reports without cause in February, 1993.
 So long as Webb can show--with all of her evidence, even that outside the 300-day period--that she was subjected to a "hostile workplace" and that the hostility continued into the 300-day period, her EEOC charge is timely. We believe that she has, at least to the extent required to survive summary judgment.
 On the other hand, because we find that summary judgment was appropriate on the merits of her other (religion and disability) hostile workplace claims, we need not address whether those claims were timely.
 
 
 [6]
 All of Webb's allegations concerning "disability" are misplaced. She does not assert that she has a permanent or even persistent mental health problem, but rather that she became temporarily ill on account of her mistreatment at the hands of Baxter. In other words, she is not "disabled" as the Americans with Disabilities Act uses the term at all, see 29 C.F.R. Sec. 1630.2(g), (j)(2), and whatever emotional problems she had were the result, rather than the cause, of her hostile work environment
 
 
 [7]
 A male sales representative who is Jewish reported no problems with Harris' accommodation of his religion, which leads one to infer that gender, if anything untoward at all, was the reason for Webb's mistreatment