**Carrie GLOVER, Plaintiff,**

v.

**Victor Murrell OPPLEMAN, et al. Defendants.**

**No. CIV. A. 6:00CV00105.**

United States District Court,
W.D. Virginia,
Lynchburg Division.

Nov. 2, 2001.

Alexander Wayne Bell, Mary V. Barney, Law Office of Alexander W. Bell, Lynchburg, VA, for plaintiff.

Michael Leland Waltin, Hunton & Williams, Richmond, VA, William B. Poff, Victor O. Cardwell, Thomas M. Winn, III, Woods, Rogers, & Hazelgrove, Roanoke, VA, Susan Frier Wiltsie, Hunton & Williams, Washington, DC, Christopher Channing Spencer, Orran Lee Brown, Charles Kalman Seyfarth, Jill D. Jacobson, Bowman & Brooke, LLP, Richmond, VA, for defendants.

### MEMORANDUM OPINION

KISER, Senior District Judge.

Before the Court are Defendants' Motion for Summary Judgment and Motion in Limine to Exclude All Evidence Related to the Lawsuits Filed by Carolyn Neighbors and Elinor Heston Pierce Cinquemani. Both motions were filed on September 4, 2001. Defendants also filed a Motion to Strike and Motion in Limine to Exclude Evidence on September 27, 2001 (collectively, "Defendants' Motions").

In her Amended Complaint of May 17, 2001, plaintiff Carrie Glover claims damages under Title VII from a hostile work environment created by and Seven Hills Hotel Associates, a Virginia Limited Partnership (hereafter "Seven Hills"), and its general partner and manager, Victor Murrell Oppleman (Count I); quid pro quo harassment and termination by both defendants (Count II); retaliatory termination (Count III); assault and battery by Oppleman (Count IV); intentional infliction of emotional distress by Oppleman (Count V); and negligent retention by Seven Hills (Count VI). Glover seeks compensatory and punitive damages and attorneys fees. The defendants seek summary judgment on all counts of the Amended Complaint. Concurrently, they move to

exclude all evidence gathered in two prior sexual discrimination lawsuits against the defendants which the plaintiff seeks to use in support of her Title VII and negligent retention claims. They also move to strike many of the affidavits and other documentary evidence which plaintiff has offered in opposition to summary judgment.

Both parties fully briefed the issues and were heard in oral argument, ripening the motions for disposition. For the reasons set forth herein, the court holds that the defendants' Motion for Summary Judgment is **DENIED** with respect to Count I (hostile work environment under Title VII). Summary judgment is **GRANTED** with respect to Counts II and III of the Amended Complaint (quid pro quo harassment and termination and retaliation), Count V (intentional infliction of emotional distress), and Count VI (negligent retention). Summary judgment is **GRANTED IN PART** with respect to Count IV to the extent that it pleads an assault claim, and **DENIED IN PART** to the extent that it pleads battery. The defendants' Motion in Limine to Exclude All Evidence Related to the Lawsuits Filed by Carolyn Neighbors and Elinor Heston Pierce Cinquemani is **GRANTED** only as to evidence in chief. Defendants' Motion to Strike and Motion in Limine to Exclude Evidence is **GRANTED IN PART** and **DENIED IN PART** as explained more fully in this Opinion.

## I. BACKGROUND

*Facts and Procedural History*

Viewed in the light most favorable to the plaintiff, the facts are as follows: Defen-

dant Seven Hills Hotel Associates t/a the Radisson Hotel, formerly the Lynchburg Hilton, is a Virginia Limited Partnership. Defendant Victor Oppleman is both a limited partner and the sole general partner of Seven Hills. Oppleman is also the general manager of the hotel. The role of general manager is one that can be filled by another individual or entity, and in the past the hotel has been managed briefly by an individual other than Oppleman. However, Oppleman has subsequently chosen to fill that role himself. Plaintiff's Response to Defendants' Motion for Summary Judgment (hereafter "Pl.Opp."), Tab 1 (Deposition of Victor Murrell Oppleman (hereafter "Oppleman Dep.")), at 100, 131, 135. In addition to Oppleman, Seven Hills has several other limited partners who, according to Oppleman, are passive investors in the hotel. Defendants' Memorandum in Support of Summary Judgment (hereafter "Def.Mem.") at 3, Pl.Opp. at 3. The hotel's partners hold partnership meetings in which business is discussed. Pl.Opp. at Tab 2 (Deposition of limited partner Gustav Stalling (hereafter "Stalling Dep.")), at 5; Tab 3 (Deposition of Deborah Beck (hereafter "Beck Dep.")), at 97; Tab 4 (Minutes of Annual Meeting of the Seven Hills Associates, February 22, 1996).

The facts surrounding Oppleman's installation as general partner are not in the record.[1] However, the plaintiff draws the Court's attention to the fact that the limited partners have been unhappy at times with Oppleman's management, going so far as to attempt unsuccessfully to withhold Oppleman's bonus. There has apparently been litigation between the limiteds and

---

1. The record contains, at best, a much-abridged copy of a limited partnership agreement between Oppleman and undisclosed limited partners effective June 6, 1978. See Defendants' reply Memorandum in Support of Motion for Summary Judgment (hereafter "Def.Repl."), Ex. C. The excerpt before me

does not discuss relative responsibilities, liabilities, and powers, other than to state that the partnership is formed pursuant to Chapter 2, Title 50 of the Code of Virginia, then known as the Uniform Limited Partnership Act.

Oppleman, which may or may not have concerned this bonus. Pl.Opp. at Tab 2 (Deposition of limited partner Gustav Stalling (hereafter "Stalling Dep.")),. at 25. The limited partners would have been aware, for instance, of sexual harassment lawsuits against Oppleman and Seven Hills which have been filed since the limited partnership began. Pl.Opp. at 3–4 (discussing, among other documents, the Minutes of February, 1996, in which such a lawsuit is mentioned).

Ms. Glover began work for the defendants (hereafter collectively "the Hotel") as an accounting supervisor on August 23, 1999. Shortly thereafter, Glover noticed what she characterizes as "a course of crude, offensive, and demeaning conduct" by Oppleman. Pl.Opp. at 4. Oppleman constantly told dirty jokes, including jokes about women, gays, blacks, and the vicissitudes of Viagra. Deposition of Carrie H. Glover (hereafter "Glover Dep."), 123, 161–162. He told these jokes "[a]ll the time from the time he got [into the office] until the time he left." Glover Dep., 159. He also teased the employees. For example, he told Glover that banquet manager Debbie Beck must have taken the Viagara he earmarked for a friend in Florida who "wanted to lay a young babe," claiming "a woman can get as much out of it as a man." Glover Dep.,161–162. He told Beck that she "did" maintenance men because they wore a blue uniform, and commented that maybe she should get one herself. Pl.Opp., Tab 7 (Affidavit of employee Tammy Webb ("Webb Aff.")), ¶ 4. In Glover's presence he stated that Beck was too skinny to screw and that he liked "meat" on his women. Glover Dep., 166. He stated that his secretary "was screwing the maintenance staff and that all a man had to do with her was put on a work belt." Glover Dep., 203–204. He told Glover that he had hired a young secretary with no experience because she had long legs and wore short

skirts, and that he "could get used to looking at that every day." In contrast, Oppleman referred to a female employee Ms. Glover had hired as "fat and homely." Glover Dep. at 205, 216.

Early in her employment, Oppleman told Glover to keep an eye on the female accounts payable clerk and not to bend over the files around her because the clerk was a "queer." Oppleman then bent over to demonstrate how "they [lesbians] do it." Glover Dep., 183–184 (amplifying the allegation made in the Amended Complaint, ¶ 8(f)). Often, if Glover didn't laugh at the jokes or said they were not funny, Oppleman would explain them with explicit sexual gestures. Pl.Opp. at 6 (numerous citations to the record omitted). In December, 1999, he urged Glover to call a maintenance supervisor who Oppleman had fired and "offer him some" to get him to come back to work. Another time, Oppleman urged her to "offer some" to a supervisor so they could tell whether the supervisor was a "dyke." Glover Dep. 215–216.

Over the course of Glover's ten months at the hotel, Oppleman began to direct more attention specifically to Glover. In September, 1999, Oppleman came into Glover's office to show her his "collection" of Viagara. Glover Dep., 160. He began to comment on her physical appearance early in her tenure, telling her how good she looked and what a pretty smile she had. Glover Dep. 165, 182; Glover Aff., ¶ 4. He called her "honey" and "sweetie" in a way that made her uncomfortable. Glover Aff., ¶ 4. He put his arm around Ms. Glover's shoulders, kissed her cheek, and squeezed her thigh "numerous times," alone and in view of other employees. Glover Dep., 123, 165. Once, when Glover told him she did not like being kissed on the cheek, he told her "you know you like it," and "let me call your husband." Glover Dep., 163–

164. Around November, 2000, Oppleman told Glover that he wanted to buy her a blouse for Christmas, and asked her bust size. Glover replied that she did not want a gift from him, and that in any event he did not need to know her bust size. Upon hearing this, Oppleman instructed his executive secretary, Susan Neighbors, to measure her bust, which she did by sneaking up on Glover from behind with a tape measure and looping it around her against her will. Glover found this to be humiliating. Glover Dep., 162–163, 185–186. Glover's husband reported that she "came home crying" after work that evening, and a friend reports that she was very "upset" about the episode. Pl.Opp.,Tab 9 (Affidavit of John Glover, ¶ 6); Tab 10 (Affidavit of Gwen Loveless), ¶ 5.

Glover perceived Susan Neighbors as one subject of Oppleman's affections who decided to "go along with it." Pl.Opp. at 7. Glover observed Oppleman use a similar degree of crudity with Neighbors. Once, when Neighbors was discussing her desire to lose weight, Oppleman brushed against Neighbors' breasts, told her she "should not lose any there," and told her how great her breasts looked. Glover Dep., 184–185. Neighbors turned red and smacked his hand away, but apparently did not protest further. Glover Dep.,185. One of Glover's fellow employees observed Neighbors on more than one occasion seated on Oppleman's lap, and saw Oppleman put his arms around her and put his hands on her breasts. Pl.Opp. at Tab 7 (Affidavit of Tammy Webb (hereafter "Webb Aff.")), ¶ 9. Glover understood from rumors that the two were having an affair. Glover Dep., 175.

Glover found particularly threatening Oppleman's allusions to "friends" and "special friends," which, in context, she understood to refer to sexual partners. One time, Oppleman came into Glover's office complaining that his wife would not "give him some"; he reported to Glover that he had then asked his wife whether he might "phone a friend." Glover Dep.,158. In April, 2000, Glover found that her position had been advertised in the local newspaper. When she contacted Oppleman about this, he said that things went better for his "friends," that from time to time he had "special friends" that he took care of, and she could be one if she wanted. Glover Dep.,123, 172. She understood this to mean that if she gave him sexual favors her job would be secure. Glover Dep.,172, 174. In May, when Glover became openly angry with Oppleman, he told her to "remember what I told you earlier." That same month, Oppleman told Glover-the accounting department supervisor-that she was going to have to work "covers" at the Hotel bar. The task involved sitting outside the hotel bar and collecting a $3 cover charge, often until 2 a.m. Glover Dep.,192–193. Glover understood this to be punishment for not giving in to his sexual invitations. Glover Dep., 194. But he also stated that he thought they had a "deal" about her being his "special friend." Glover says she did not make or want any deals with him and that she just wanted to do her job. He said that was her choice. Glover Dep., 218. On May 28, Glover again saw her position advertised in the paper. At this point, she complained to Oppleman about "working under intolerable conditions" and threatened to tell the other partners about his behavior. Glover Dep., 196, 200. On June 6, Oppleman fired her. *See generally* Pl.Opp., Tab 8 (Glover Dep.), 190–199; Tab 5 (Affidavit of Beth [Carrie] Glover ("Glover Aff.")), ¶¶ 5–8.

Emotional distress which Glover suffered as a result of Oppleman's behavior included sleeplessness and severe fatigue, increasing mental anguish, depression, loss of enjoyment of life, and decreased sexual relations with her husband. Glover Dep.,

226–228; John Glover Aff., ¶¶ 6–10. In September, 2000, about two months after she was fired, she sought medical treatment "solely as a result of. . . the stress of what had happened while [she] was employed." Glover Dep., 245–246. After an October 11 doctor's visit she was diagnosed as having anxiety and situational depression, including crying spells, decreased motivation, and fatigue. She was treated for several months with Vistaril (an anxiety medication), and increasing dosages of Prozac. Glover Dep., 243–246. Glover's husband affies that she had not been under medical care for any of these conditions until the later months of her employment at the Hotel. John Glover Aff. ¶¶ 10–11. Ms. Glover was subsequently treated with medications until at least April, 2001. Glover Dep., 249. Currently, Glover is happily and successfully employed as a controller and accounting manager at another business class hotel in Lynchburg. Glover Aff., ¶ 26; John Glover Aff., ¶ 11.

Glover's account of the workplace environment at the hotel is corroborated by at least two roughly contemporary employees. Lynn Thacker, a sales secretary at the hotel from April, 2000 to January, 2001, affies that Oppleman constantly visited the women in the administrative offices of the hotel, although his own office was at the opposite end of the building. Oppleman was known among the women as a "dirty old man," and used foul and sexually suggestive language on a regular basis with them. Thacker also witnessed Oppleman's proud display of his Viagara supply, and his boast that it helped him "get it up" for sex "all night." One time, when she had been sitting beside Oppleman on a couch in the lobby and put her hand down to stand up, Oppleman moved his leg so that her hand touched it instead of the sofa. In front of other employees Oppleman told her that if "she put her hand

further up" his leg, they "could discuss the day off that [Thacker] wanted." Thacker reports that Glover's allegations are "very typical of [Oppleman's] harassing behavior during the time that Beth Glover and [Thacker] worked at the Hilton," and she specifically corroborates a half dozen of the episodes Glover testified to in deposition. According to Thacker, the female employees at the hotel were expected to put up with Oppleman's behavior as part of the terms and conditions of their employment. Thacker herself left the hotel in January of 2001 "because of the Hostile work environment created by" Oppleman. Pl.Opp. at 6 (Affidavit of Lynn Thacker), ¶¶ 1–13.

Tammy Webb, a banquet manager at the Hotel from early 1997 to December, 1998, and sales secretary from March 1999 to July 1999, corroborates Glover's and Thacker's general observations, and specifically recalls Oppleman's comments to Debbie Beck concerning men in blue uniforms. According to Webb, Oppleman frequently commented on the bodies of women guests, employees, and job applicants to the other employees. He told Webb, "I haven't seen headlights like that on a penguin," referring to her own breasts. More than once he tried to take Webb's hand and put it on his crotch or tried to pull her skirt up. Also more than once he asked Webb, "Have you sucked any good dick lately?" or "Why don't you try this one?" while gesturing toward his crotch. He showed Webb an injection device that, before Viagara, he "had to stick in his dick" to get an erection. Webb repeats the rumor concerning Oppleman's open sexual liaison with his secretary Susan Neighbors. Like Thacker, she reports that female employees were expected to put up with Oppleman's behavior "as part of their job." Though the female employees complained among themselves, Oppleman con-

stantly reminded people that he was the general manager, and if they didn't like his talk and actions, they could leave, telling them that they were at-will employees under state law who could be fired for any reason. Pl.Opp. at 7 (Affidavit of Tammy Webb), ¶¶ 2–11.

Central to Glover's negligent retention claim is the fact that her complaints are not news to the Hotel. Elinor Pierce Cinquemani worked for Oppleman between June 1991 and April 1992 before bringing a sexual harassment lawsuit against the Hotel in April, 1994. Carolyn Neighbors worked for Oppleman between November 1992 and June 1993 before doing the same in June, 1994. The *Cinquemani* and *Neighbors* lawsuits were settled before trial in 1995 and 1996, respectively. Although the pleadings in those cases are not in the record, excerpts of depositions taken during the *Neighbors* case are, and lead me to presume that plaintiffs' claims in those cases were similar to Glover's. Waitress Linda Jean Martin worked for the Hotel from summer of 1992 through the winter of 1994. In her deposition for the *Neighbors* case, she testified that Oppleman once put his hand up her skirt between her legs and grabbed her. Oppleman, always the jokester, also encouraged her to "hop up" on a banquet table and "spread [her] legs" for the security camera. Her testimony shows that the pattern of verbal behavior alleged by Glover was also experienced by employees during Thacker's time with the Hotel. Pl.Opp. at 12 (excerpts from the Deposition of Linda Jean Martin, April 25, 1995). Cinquemani, deposed during the *Neighbors* suit as well, testified that Oppleman invited her into his office to watch porn movies in October, 1991; shook her shoulders so he could, as he said, "see [her] breasts move" on several occasions; and invited her in public to give him a blow job in the hotel Jacuzzi. Pl.Opp., Tab 13 (excerpts from the Deposi-

tion of Elinor P. Cinquemani, June 6, 1995). Plaintiff Carolyn Neighbors testified that Oppleman pestered her to see operation scars in a private area; when she refused, he stated "if you don't show me your scars, you won't have a job," then stated "[i]t doesn't matter. I've seen your pussy; I've had your pussy before anyway." She also testified about language similar to that reported by the other women. Pl.Opp., Tab 14 (excerpts from the deposition of Carolyn D. Neighbors, December 22, 1994).

Glover filed a charge of discrimination with the EEOC on July 26, 2000. On September 8, 2000, the EEOC issued a right-to-sue letter. Glover filed her original complaint with this court on November 21, 2000, amending it on May 17, 2001. In their Motion for Summary Judgment, the Hotel claims that Glover's Title VII claims must fail as a matter of law, as she does not allege behavior of sufficient severity or pervasiveness to support a hostile environment claim. The Hotel argues that Oppleman's friendly kisses and hugs were not made with sufficiently actionable intent or offensiveness to support claims of assault and battery, and that Glover's emotional anguish was not sufficiently severe to meet the high threshold of harm required to prove intentional infliction of emotional distress. Finally, the Hotel argues that Virginia law bars claims of negligent retention against a limited partnership. The Hotel also seeks to exclude all evidence from the *Cinquemani* and *Neighbors* lawsuits, arguing that its use would be an unfair surprise; would not be relevant; would present a risk of unfair prejudice, confusion of the issues, and undue delay substantially outweighing its probative value; and would be impermissible evidence of prior bad acts. Finally, in its Motion to Strike and Motion in Limine, the Hotel seeks to exclude most of the exhibits Glo-

ver presents in opposition to summary judgment, claiming that these are either inadmissible hearsay, impermissible embellishment or contradiction of prior deposition testimony, or barred for reasons argued in the former motion in limine.

During briefing and oral argument, the plaintiff stated that she no longer intends to pursue her quid pro quo harassment and termination and retaliation claims under Title VII. I therefore grant the Hotel's motion for summary judgment with respect to Counts II and III without further analysis.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The existence of an alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment, unless the disputed fact is one that might affect the outcome of the litigation. *Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir.2001). Mere speculation by the non-movant cannot create a genuine issue of material fact. *Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir.2001). A material fact is one whose existence or non-existence could result in a different jury verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, such inferences must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Thompson Everett, Inc. v. National Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir.1995). The function of the judge at the summary judgment stage is not to determine the truth of a matter or to weigh credibility but to determine whether there is any genuine issue of fact that can only properly be resolved by a finder of fact because it could reasonably be resolved in favor of either party. *JKC Holding Co., LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 464–65 (4th Cir. 2001) (*citing Anderson*, 477 U.S. at 250, 106 S.Ct. at 2505).

## III DISCUSSION

Because my evidentiary rulings will be dispositive to a number of issues at summary judgment, it is necessary that I rule on the motions in limine as a preliminary matter.

### A. Motion in Limine to Exclude Evidence of the *Cinquemani* and *Neighbors* Lawsuits

In support of her negligent retention and hostile environment claims, the plaintiff seeks to introduce selected deposition transcripts from prior harassment lawsuits against the defendants. Elinor Pierce Cinquemani worked for Oppleman between June 1991 and April 1992 before bringing a sexual harassment lawsuit against the Hotel in April, 1994. Carolyn Neighbors worked for Oppleman between November 1992 and June 1993 before doing the same in June, 1994. Waitress Linda Jean Martin worked for the Hotel from summer of 1992 through the winter of 1994. Her deposition was taken during the course of the *Neighbors* lawsuit. The *Cinquemani* and *Neighbors* lawsuits were settled before trial in 1995 and 1996, respectively. Although the pleadings in those cases are not in the record, excerpts

of depositions taken during the *Neighbors* case are attached to Glover's Memorandum in Opposition to Summary Judgment, and lead me to presume that plaintiffs' allegations in those cases were similar to Glover's here.

■ The Hotel's most cogent argument for the exclusion of the evidence is that Fed.R.Evid. 403 bars it because it is substantially more unfairly prejudicial than probative. That rule permits judges to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Review of evidence under Rule 403 entails a dual inquiry. I must first look to the "probative value of the evidence in question, and then examine the possibility that the evidence will cause unfair prejudice to the defendant." *See Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853 F.2d 1130, 1133 (4th Cir.1988) (applied to a defendant's past racial slurs). In evaluating the latter possibility I keep in mind that all relevant evidence is "prejudicial" in the sense that it may prejudice the party against whom it is offered. Rule 403 is concerned with "unfair" prejudice. Prejudice is "unfair" when it will excite a jury to make a decision on the basis of a factor unrelated to the issues properly before it. *Mullen*, 853 F.2d at 1134 (*citing Pine Crest Preparatory School, Inc. v. Phelan*, 557 F.2d 407, 409 (4th Cir.1977); 1 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 403[03] (1986)).

■ A number of opinions cited by both parties state that prior harassment of other parties is relevant for establishing intent, motive, discriminatory state of mind, or notice, as long as the events are not too attenuated in subject matter and time. It is not necessary for a Title VII plaintiff to have been the object of this harassment, or even to have observed it. *Vinson v. Taylor*, 753 F.2d 141, 146 (D.C.Cir.1985), *aff'd sub nom., Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Mullen*, 853 F.2d at 1134 (citations omitted) (evidence of past racial slurs directed to other parties is relevant in race discrimination cases). However, common sense dictates that the older such evidence is, the less probative it becomes for present purposes. In *Patterson v. McLean Credit Union*, 805 F.2d 1143, 1145–1147 (1986), the Fourth Circuit upheld a district court's exclusion of evidence that a co-worker had experienced racial harassment two to ten years before the alleged behavior at issue in the plaintiff's § 1981 claim. The court held that the evidence's probative value on the issue of discriminatory intent was outweighed by its remoteness in time and it potential to confuse and mislead the jury. 805 F.2d at 1147. In *Summit v. S–B Power Tool*, 121 F.3d 416, 422 (1997), the Eight Circuit upheld a district court's decision to bar evidence that a plaintiff had been sexually harassed six years prior to her alleged constructive discharge, reasoning that while the evidence "may have some slight relevance in showing motive," it did nothing to show why a plaintiff may have felt compelled to quit six years later. In *Stair v. Lehigh Valley Carpenters Local 600*, 813 F.Supp. 1116, 1119–20 (E.D.Pa.1993), a district court excluded evidence of prior harassment against another female employer solely on the basis that the prior harassment took place four years before the plaintiff began her job. *See generally Garvey v. Dickinson College*, 763 F.Supp. 799 (M.D.Pa.1991) (and cases cited therein).

■ While I recognize that evidence of hostile working conditions existing slightly before and slightly after the period in

which Glover worked at the Hotel are still relevant to her Title VII claim—showing the conditions into which she entered and from which she left, and the objective offensiveness of those acts to similarly situated women-evidence of harassment occurring (at the most recent) five years before Glover began work at the Hotel is only very weakly probative. Only if other admissible evidence showed that this evidence was, for example, part of a continuing course of conduct bridging the intervening years would I be persuaded that these incidents are more solidly probative of Oppleman's present behavior. Plaintiff has offered no such bridging evidence, however. Furthermore, such acts in a harassment case are usually probative of motive in an employment decision. Here, Oppleman's motive as a harasser is not particularly germane to Glover's hostile environment claim. Whether or not he behaved with nefarious intentions toward Ms. Glover and her contemporaries, his actions will be judged by an objective standard. Furthermore, substantially outweighing the weakly probative value of this evidence is a risk of great unfair prejudice to the defendant. "Lumped in" with testimony concerning Oppleman's contemporary behavior, this evidence would easily mislead jurors to find Oppleman liable almost entirely due to acts occurring from five to nine years before the alleged behavior in this case. Therefore, I exclude this evidence from use on direct with regard to Glover's hostile environment and battery claims, and strike it from the record considered on summary judgment.

■ While I recognize that past acts are usually directly relevant to claims of negligent retention—constituting proof of past behavior of which a defendant employer should have been on notice—I must also exclude evidence from the lawsuits in question with respect to Glover's negligent retention claim. I do so because the events are simply too remote in time to be probative of Oppleman's risk to future employees such as Glover. I also find it significant that Oppleman was never found liable of harassment or battery during the course of the *Neighbors* and *Cinquemani* lawsuits, which were settled before trial. It is entirely possible that he was innocent of the plaintiffs' claims in those cases. Thus, there is only a very weak factual predicate for believing that Oppleman posed a risk of harassment and battery to Ms. Glover five to nine years later. Substantially outweighing the very weak probative value of this evidence is an overwhelmingly risk of unfair prejudice to the defendant, as well as the risks of delay and confusion of issues. Faced only with select, unexamined allegations of bad conduct by Oppleman, it would far be too easy for a jury simply to find the Hotel liable by reason of an unproven predisposition for sexual harassment. Accordingly, I exclude evidence from the prior lawsuits with regard to plaintiff's claim for negligent retention.

## B. Motion to Strike and Motion to Exclude Evidence

The Hotel asks the court to strike most of the exhibits attached to the plaintiff's Memorandum in Response to Defendants' Motion for Summary Judgment. The Hotel argues that these affidavits are either irrelevant, inadmissible hearsay, or impermissible embellishment of deposition testimony, and wants them both struck from plaintiff's brief and ruled inadmissible at trial. As set forth below, I grant the Hotel's motions in part.

*Deposition of Gustav Stalling, III (Pl. Opp., Tab 2).* Glover uses the deposition of this limited partner in an attempt to offer a genuine issue of material fact concerning the limited partners' actual control

of the partnership-and, in turn, the partnership's liability for negligent retention. Stalling mainly recounts an episode in which the limited partners consulted counsel in preparation for bringing an action against Oppleman. The Hotel argues that it is irrelevant because Virginia's Revised Uniform Limited Partnership Act, Va. Code. § 50. 1, et seq., shields limited partnerships from tort liability. As I discuss below, this is an incorrect reading of the statute. I therefore deny the Hotel's motion with respect to this document.

*Minutes of Seven Hills meeting, February 22, 1996 (Pl.Opp., Tab 4).* Proof that the limited partners were told about the *Cinquemani* lawsuit may be relevant to the negligent retention claim, at least with respect to determining when notice was taken. For that reason, I deny the Hotel's motion with regard to this document.

■ *Affidavit of Beth Glover (Pl.Opp., Tab 5):* This affidavit contradicts point-by-point the Hotel's assertions of her incompetence and the non-discriminatory reason for her firing-issues which have become mooted by the plaintiff's withdrawal of her quid pro quo and retaliation claims under Title VII.. To the extent it adds testimony concerning Glover's hostile environment claim, nonetheless, the Hotel says it runs afoul of *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (citations omitted). In that case, the Supreme Court stated that "a party cannot create a genuine issue of material fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (for example, by filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." The Hotel's reliance on *Cleveland* is misplaced to the extent Glover does not contradict any prior statement in her de-

position, but merely organizes what she already said in answer to limited questions on the subject; or remembers additional incidents which she could not reasonably recall during deposition. *Cleveland* does not restrict a plaintiff's evidence only to what she said in her deposition. Furthermore, it appears that the Hotel first made its case for Glover's incompetence in its Memorandum in Support of Motion for Summary Judgment. The fact that the Hotel didn't grill Ms. Glover on the subject during her deposition shouldn't prevent her from having a response to the Hotel's version of her termination and her motives for bringing this lawsuit.

The Hotel says that Glover's memory has dishonestly "improved" because she recounts some instances in the affidavit that she couldn't remember at the deposition. Mem.Strike at 3 (*quoting* Glover Dep., 283–284). Again, to the extent that this is not contradiction of prior testimony, but additional remembered events that she could not reasonably be expected to recount *in toto* during a stressful deposition, the affidavit may be admitted.

With this standard in mind, I find that the points raised in Glover's affidavit are either summaries of previous testimony, additional remembered examples of certain kinds of offensive behavior, or testimony adduced in rebuttal to new points made by the Hotel in support of the its Motion for Summary Judgment. Paragraphs 1 and 2 of the affidavit are introductory. Paragraph 3, in which Glover explains that Oppleman's offensive conduct "took place on a regular basis," is supported by Glover's deposition as summarized above. Glover Dep., 123, 159, 161–164 (Oppleman made offensive comments and jokes, kissed her, and squeezed her thigh regularly). Paragraph 4, in which Glover affies that Oppleman called her "sweetie" and "honey" and made constant compliments

concerning her appearance, including comments in front of her husband, are corroborated by John Glover anyway, and are not in contradiction with any answer Ms. Glover made during deposition. John Glover Aff., ¶ 4. As such I view them as additional recollected examples of the harassment against which Glover generally complains. Paragraphs 5–8, recounting Oppleman's innuendo concerning "special friends" and her reaction to it, were already discussed during the deposition at various places. *See, e.g.,* Glover Dep., 123, 158, 172, 174, 190–199, 200, 218. Paragraph 9 is generalized testimony concerning her emotional distress, and does not contradict anything she said about this during her deposition. *See, e.g.,* Glover Dep., 226–228; John Glover Aff., ¶¶ 6–10. Paragraphs 10–25, as previously discussed, merely rebut points concerning Glover's job performance raised largely for the first time in affidavits which the Hotel attached to its own motion for summary judgment. To the extent the Hotel even asked Glover about these points during the deposition, I do not find that she has contradicted her deposition testimony. *See, e.g.,* Glover Dep. 109–111 (denying accusations made by Melissa Taylor and Pat Whorley).

In short, I see no contradiction or disparity between the deposition transcript and the affidavit. Accordingly, the Hotel's motion with regard to Ms. Glover's affidavit is denied.

■ *Affidavit of Lynn Thacker (Pl. Opp., Tab 6).* Lynn Thacker worked for the Hotel from April, 2000, to January, 2001. Her employment period thus overlapped Glover's by three months. Apparently, she does not state in her deposition (at least the excerpts in the record) exactly when the events happened of which she testified. The Hotel argues that this is a failure to establish a foundation for her testimony, and that the testimony should therefore be struck—apparently because all of the events which she reported might turn out to have happened after Glover left the Hotel. The Hotel's argument rests upon an erroneous legal standard which says that, in order to be probative of a hostile environment claim, acts must have been observed by the plaintiff. As explained above, this rule was rejected by the Fourth Circuit in *Mullen,* 853 F.2d at 1134 (error to exclude racial epithets not pertaining to or heard by plaintiff); as well as by the court in *Vinson v. Taylor,* 753 F.2d 141 (D.C.Cir.1985) (error to exclude in hostile environment cases), and *Stair,* 813 F.Supp. at 1119 (same). Even if some or all of the harassment seen by Thacker occurred up to six months after Glover left the Hotel, I find under the precedents discussed previously that this evidence is close enough in time to be probative of a hostile work environment at the Hotel.

*Affidavit of Tammy Webb (Pl.Opp., Tab 7):* Webb worked at the Hotel from 1997 until July, 1999, a month before Glover started work there. The Hotel makes the same argument as it did with regard to Thacker's affidavit, and I hold similarly.

■ *Affidavit of John Glover (Pl.Opp., Tab 9):* The Hotel is correct in pointing out that most of what is contained in this affidavit is hearsay from Glover's husband concerning daily events at the Hotel. As such, most of it is inadmissible on the federal claims. On the other hand, several paragraphs of the affidavit go to Glover's emotional state after particular days of work (e.g., the bust-measuring episode), her gradually increasing depression, and her medical history. As such, these are non-hearsay observational reports relevant to Glover's emotional distress claim. They are also relevant to rebut the Hotel's characterization of her motive in bringing a lawsuit. Accordingly, I strike ¶¶ 3, 4 (first

sentence only), 5, and 8. All other statements are admitted.

■ *Affidavit of Gwen Loveless (Pl. Opp., Tab 10):* Loveless, never an employee of the Hotel, is Glover's friend. Her affidavit reports hearsay from Glover concerning the environment at the Hotel, and reports direct observations of Glover's reactions. Because the Hotel intends to dispute whether Glover found her treatment "offensive," Loveless' observations of Glover's moods and attitude toward work are competent lay observations and are relevant. Accordingly, I strike ¶¶ 3, 3 (duplicate), and 4, and deny the Hotel's motion with respect to all other statements.

*Deposition of Linda Jean Martin, April 28, 1995 (Pl.Opp., Tab 12); Deposition of Elinor Cinquemani, June 6, 1995 (Pl. Opp., Tab 13): Deposition of Carolyn Neighbors, December 22, 1994 (Pl.Opp., Tab 14):* These are all depositions taken during the *Neighbors* lawsuit, discussed previously. I grant the Hotel's motions with respect to these depositions..

*Release presented to Shannon Day (Pl. Opp., Tab 15):* The Hotel admits that Oppleman offered this former employee "a small sum of money" (Glover says $50) to make this statement, which says that Day had never been mistreated. The form, which Day purportedly refused to sign, is type-dated July 31, 2001. It is not clear for what purpose Glover offers it, other than to show Oppleman's typical "arrogance." Pl.Opp. at 10, 10 n.2. Glover states that "Day refused to sign it because the facts it contained were false," but does not state that they were false because of harassment by Oppleman. Pl. Opp. at 10, n.2. The Hotel says Day quit over a dispute concerning tips. Mem.Strike at 7. Says the Hotel, "[t]he Court can take judicial notice that employers today, because of their vulnerability to lawsuits of all kinds from disgruntled former employees,

commonly seek releases for consideration." *Id.* There is no testimony concerning it from Shannon Day herself, and no evidentiary foundation for the document that I can find in the record, other than the Hotel's admission.

At oral argument, plaintiff's counsel informed the Court that Shannon Day intends to testify as to the harassment she herself suffered from Oppleman. So as not to preclude prematurely evidence which may turn out to be relevant and admissible at trial, I will strike the exhibit only from the record at summary judgment, and reserve judgment on the motion to exclude until I see for what use this exhibit will be offered at trial.

*Progressive discipline forms (Pl.Opp., Tabs 17, 18, 19).* The Hotel previously offered a completed discipline record to the EEOC to show a legitimate non-discriminatory reason for firing Glover. Glover claims it is manufactured evidence. Pl.Opp. at 12 n. 3. Assuming the Hotel does not plan to offer them, and assuming the reasons for Glover's firing stay out of the case due to the withdrawal of Glover's quid pro quo and retaliation claims, the documents are not relevant to any claim or defense remaining. Accordingly, I will grant the Hotel's motion with regard to these documents.

### C. Motion for Summary Judgment

*1. A reasonable jury could find that the defendants maintained a hostile work environment.*

■ Title VII prohibits employers from discriminating against an employee based on sex with respect to the terms, conditions, or privileges of employment. 42 U.S.C. § 2000e–2(a)(1). Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action. *Meritor Sav. Bank, FSB v. Vinson,*

477 U.S. 57, 73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In order to succeed on a claim of hostile workplace harassment, the EEOC must prove the following: (1) the harassment was because of sex; (2) the harassment was unwelcome; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) some basis exists for imputing liability to the employer. *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir.1997).

■ In *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), the Supreme Court explained the standard by which courts should evaluate the severity element of hostile work environment claims.

[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all of the circumstances.' In ... harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by the target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field-even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations and relationships which are not fully captured by a simple recitation of words used or physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing... and conduct which a reasonable person in the plaintiff's posi-

tion would find severely hostile or abusive.

523 U.S. at 81–82, 118 S.Ct. 998 (*quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). In the Fourth Circuit, as elsewhere, courts deciding hostile environment claims must examine the totality of circumstances, including "the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745, 753 (4th Cir.), *cert. denied*, 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996). Title VII is not a civility code, however, and does not try "to purge the workplace of vulgarity." *Hopkins*, 77 F.3d at 753, 755.

■ If isolated incidents are not in themselves "severe" enough to alter workplace conditions, numerous or repeated incidents may still be "pervasive" enough to alter workplace conditions and create a hostile work environment. Thus, derogatory comments made "more than thirty times in the first few weeks" of a plaintiff's employment were counted sufficiently pervasive by the court in *Smith v. First Union Bank*, 202 F.3d 234, 238 (4th Cir.2000), and disparaging comments made "repeatedly" or "frequently" were credited by the court in *EEOC v. R & R Ventures, Inc.*, 244 F.3d 334, 337–338 (4th Cir.2001). On the other hand, seven isolated incidents occurring over seven months were considered insufficiently pervasive to support a hostile environment claim in *Patterson v. County of Fairfax, Virginia*, 2000 WL 639318, *2 (4th Cir. May 18, 2000); four isolated verbal comments were held to be insufficiently pervasive in *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 772 (4th Cir.1997); "temporally diffuse, ambiguous" conduct was rejected by the court in *Hop-*

*kins*, 77 F.3d at 753; and nine unwelcome comments "spread over months" was rejected by the court in *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430–431 (7th Cir.1995).

Evidence of hostile work environment is not limited to unwanted sexual touching and propositions. "A work environment consumed by remarks that intimidate, ridicule, and maliciously demean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual advances." *R & R Ventures, Inc.*, 244 F.3d 334, 340 (4th Cir.2001) (*quoting Smith*, 202 F.3d at 242 (reversing district court's summary judgment in a case in which plaintiff's supervisor had made neither sexual advances nor sexual propositions)). In *R & R Ventures*, the court reversed a district court's summary judgment for the defendants, where the defendant supervisor's behavior consisted solely of pervasive comments about female workers' buttocks and breasts and sexual proclivities. In *Smith*, the Fourth Circuit reversed a summary judgment in favor of defendants on the issue of severity and pervasiveness, although there was no allegation of unwanted advances and touching, and only numerous derogatory sexual remarks about women in general. 202 F.3d at 234, 243 n. 6. In *Hartsell*, derogatory comments about women, many of which were not even sexual, were at least counted for purposes of determining pervasiveness. 123 F.3d at 773. In *Patterson*, remarks of "dumb bitch" and "cruiser butt" were counted. 2000 WL 655984, *3. Even in *Breda v. Wolf Camera, Inc.*, an opinion showcased by the Hotel in its briefs, the court recognized that insult and ridicule by itself could reach a sufficiently severe and pervasive level to create a hostile environment; "sexual touching, grabbing, fondling (etc.) is simply not necessary." 148 F.Supp 2d 1371, 1376–1377 (S.D.Ga.2001)

(*quoting R & R Ventures*, 244 F.3d at 338–339) (other citations omitted).

▮ Furthermore, even though the plaintiff in this case has abandoned her quid pro quo claims, evidence of quid pro quo threats may be used to support her hostile environment claim. *See Burlington Industries v. Ellerth*, 524 U.S. 742, 751–754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (explaining that a "threat carried out," or quid pro quo threat, is an action that violates Title VII all by itself; anything short of a threat carried out must be sufficiently severe and pervasive to violate Title VII as a hostile work environment). Such threats do not have to be express, either. In *Ellerth*, a supervisor's admonishment to "loosen up," after a female employee did not respond to his comments about her breasts, because he "could make [her] life very hard or very easy" was counted as an unfulfilled "threa[t] to alter a subordinate's terms or conditions of employment." 524 U.S. at 748, 754, 118 S.Ct. 2257.

▮ All of the evidence produced by Ms. Glover is of behavior that is either clearly unwelcome harassment "because of sex," or is of behavior that could be inferred to be such by a finder of fact. The Hotel's characterization of the evidence as "occasional vulgar banter, tinged with sexual innuendo," which does not support a Title VII claim, is not entirely supported by the authorities it cites. First of all, it ignores-contrary to *Oncale*-the social context in which the "banter" took place. The workplace in question was not a men's locker room but the administrative offices and lobby of a luxury hotel staffed mostly by young women. Oppleman's behavior was not acceptable in this context. Opinions cited by the Hotel do not say otherwise. Kissing and comments about penises discounted in *Hopkins* as "sexually neutral, or at most, ambiguous" is compli-

cated by the fact that the alleged discrimination in that case was male-on-male, and by the fact that the plaintiff never alleged the touching was sexual. 77 F.3d at 753. The court in that case could easily find that the alleged incidents were male teasing, and not sexual harassment. In *Hartsell,* the court found that many derogatory comments were not related to the plaintiff's gender, but to her status in the workplace. 123 F.3d at 772. In *Patterson,* the court found many non-sexual insults and pranks (e.g. putting a dead mouse in plaintiff's mailbox) to be "adolescent" and "mean-spirited behavior" which was not gender- or racially-based. 2000 WL 639318, *2. In *Breda,* the court discounted some incidents in which male mall co-employees ogled and cat-called female customers in the plaintiff's presence, or in which they complained about women taking too long in the bathroom; other incidents involving pornographic comments were still "harassment," only not pervasive enough to be actionable. 148 F.Supp.2d at 1382. In this case, all or almost all of the discrete incidents alleged by Glover at her coworkers were directed at them or women generally, and were all sexual in nature and as such offensive to Glover.

Because much of Oppleman's behavior is testified to have been "regular" or "constant," I decline the Hotel's invitation to calculate the frequency at which Oppleman's harassing acts occurred, but it is certainly more than the "once every three weeks" represented by the Hotel. Glover's supported allegations include approximately 19 incidents or customary practices (such as dirty-joke telling, with explicit gestures and explanations) over the course of her ten months at the Hotel. *See* Pl.Opp. at 4–11 (in detail), and 18 n. 6 (summary). These were not all discrete comments or incidents; many

are summaries of habitual practices. When asked how often Oppleman put his arm around her or touched her legs, Glover testified "[n]umerous times; numerous times. I can't even count." Glover Dep., 165. He told dirty jokes "always" and "every day." Glover Dep., 165–166. These were not just off-color jokes, but explicit comments and fantasies about his wife and other employees which "he was always coming into" her office to tell her. Glover Dep.,158. Lynn Thacker's affidavit includes reputation evidence of Oppleman as "a dirty old man," "foul and sexually suggestive language on a regular basis," "constan[t] ... comments about the bodies and looks of the women working at the Hilton," "frequen[t] ...sexually explicit 'jokes,' and recounts six other specific incidents. Tammy Webb corroborates the routine behavior cited by Glover and Thacker, and reports five other specific incidents. The evidence clearly establishes a frequency of conduct much greater than that rejected as insufficiently pervasive by the courts in *Patterson, Hartsell, Hopkins,* and *Baskerville;* and suggests the regularity credited by the courts in *Smith* and *R & R Ventures.* Furthermore, Glover's version of the bust-measuring episode and Oppleman's veiled threats concerning his "special friends" just preceding Glover's firing would, if believed by a jury, constitute particularly "severe" harassment. Examining the evidence "from the perspective of a reasonable person in the plaintiff's position, considering all of the circumstances," a jury could reasonably find that Oppleman's behavior was sufficiently severe and pervasive enough to interfere unreasonably with Glover's work performance, constituting a violation of Title VII.[2]

2. The Hotel's insistence that the alleged

harassment in this case is much more benign

*2. Glover's allegations, if proven, establish a case of battery.*

In Virginia, the tort of battery is established by "the slightest touching of another... done in a rude, insolent, or angry manner." *Pugsley v. Privette*, 220 Va. 892, 899, 263 S.E.2d 69, 74 (Va.1980) (citation omitted). At common law, a person commits the tort, among other ways, by an act "intending to cause a harmful or offensive contact with the person of the other or a third person." *Restatement of Torts, Second*, § 18. In this case, the plaintiff bases her battery claim on Oppleman's unwanted kisses, hugs, and touches, as well as the incident in which Oppleman had a hotel employee measure Glover's bust against her will after she refused to tell him her size. The Hotel argues that these allegations cannot support a battery claim because the evidence only shows that Oppleman's intent in kissing Glover was benign (e.g., motivated only by gratitude or non-sexual affection); that when Oppleman touched Glover's legs, arms, or shoulders, he did not do so in a way that was rude, angry, or insolent; that there is no evidence Glover found the touchings offensive; and that, with regard to the bust-measuring incident, Oppleman did not touch Glover. Def.Mem. at 35–37.

None of these defenses have merit under Virginia precedent or common law. While it is true that the act causing the contact must have been intended to cause contact, there is no authority for the proposition that the act must be *intended to be* rude, angry, or insolent. *Wood v. Commonwealth*, 149 Va. 401, 140 S.E. 114 (1927), cited by the Hotel for the proposition that battery has an intent element, does not specify the quality of the intent required. Furthermore, that case dealt with the *crime* of assault-and-battery as it stood in 1927. The Hotel does not say why the elements of the crime and those of the tort must be identical, and I have not found independent authority or good reason for that proposition. If battery required intent-to-be-offensive, then no supervisor who considered himself to be irresistible to his female employees could be found liable of battery. Oppleman's motives in kissing or touching Glover are irrelevant as long as he intentionally acted to kiss or touch Glover, and the touching was offensive or unwelcome.

While the evidence does not support an inference that Oppleman touched or kissed Glover in an "angry" manner, it does support a reasonable inference that he did so in a rude or insolent manner. Kissing, touching, fondling, or measuring the bust size of a woman employee who does not want to be kissed, touched, or have her breasts measured by her male supervisor is rude and insolent. *See Prosser and Keaton on Torts*, 5th Ed., § 9 ("Battery") (West 1984), 42 n.6 ("[t]aking indecent liberties with a person without consent is of course a battery") (citations omitted). At the very least, the parties' witnesses disagree on the manner in which

than the behavior purportedly rejected as insufficiently severe in *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262 (4th Cir.2001), is without merit. In *Barrett*, the jury found for the plaintiff on her Title VII claim; the district court granted employer ARECO a judgment notwithstanding the verdict, holding that ARECO had established an affirmative defense to strict liability for its supervisor under *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–808, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The Fourth Circuit affirmed in part, holding only that "the severity of an employee's transgressions are not a basis for automatically imputing liability to an employer." 240 F.3d at 270. Only the application of the *Faragher* defense-not the sufficiency of plaintiff's case against her harasser-was at issue in that appeal.

Oppleman did these things, creating an genuine issue of material fact.

The quality of the act's offensiveness is judged by an objective standard. Although the evidence shows that Glover and at least two co-workers found Oppleman's liberties offensive, the law does not require them to have found them so. The rule of *Pugsley* says nothing about the tort victim's reaction. Indeed, comment (d) of the *Restatement* gives this apt illustration: "A kisses B while asleep but does not waken or harm her. A is subject to liability to B." As before, a reasonable jury could find that Oppleman's contacts were done in a rude or insolent manner.

The tort of battery requires only an intentional act "caus[ing] a harmful or offensive contact," not a direct contact by the tortfeasor. Comment (b) to the *Restatement* gives the following example of "acts intending to cause": "[I]f a third takes hold of the defendant's hand and slaps another's face, the only act is that of a third person. The defendant's hand is used merely as an instrumentality by which the third person accomplishes his purpose." If the law views the employee who measured Glover's bust as an instrumentality of the man who ordered her to do so, the incident constitutes battery by Oppleman. On this question of law, neither party has cited an authority on point, and I have found none independently. To take an analogy from criminal law, however, one who orders an agent or cohort to carry out a specific criminal battery usually shares the cohort's guilt under a theory of conspiracy, solicitation, or aiding and abetting. I find it hard to believe that Oppleman would not be liable for battery if the employee had been his bodyguard and he had ordered him or her to beat up Glover instead of measuring her bust.[3] Given Glover's particular testimony-that Oppleman intended and ordered the very act which his employee immediately committed in his presence-I find that the Hotel is not entitled to summary judgment with regard to the bust-measuring incident just because Oppleman did not put his own hands on Ms. Glover.

Ms. Glover's claim for assault is a different matter. Under Virginia law, the tort of assault is "the threat of bodily harm." *Collins v. Franklin*, No. 2:00cv00044, 2001 WL 589029 (W.D.Va. May 29, 2001) (*citing Simmons v. Norfolk & Western Ry.*, 734 F.Supp. 230, 232, n. 2 (W.D.Va.1990)). Mere insulting and abusive words alone cannot constitute actionable assault. *Simmons*, 734 F.Supp. at 232. There is no evidence of any threat of physical harm in the record. I will therefore grant the Hotel's motion for summary judgment on Count IV to the extent that it pleads the tort of assault.

*3. The evidence would not permit a finding of intentional infliction of emotional distress.*

To prove intentional infliction of emotional distress resulting from a non-tactile tort under Virginia law, a plaintiff must prove by clear and convincing evidence: (1) that a wrongdoer's conduct was intentional or reckless, (2) "conduct...so outrageous in character, and so extreme in

---

3. *See, e.g., Higgins v. Investors Acceptance Co. of Miami*, 287 So.2d 724 (Fla.App.1974), in which a bill collector had his hired bodyguard spray mace into a debtor's face in an attempt to collect on a debt. The appeals court held that the bill collection company was not liable for battery, but only because there had been insufficient proof that the bodyguard was really an employee of the company. The court's opinion addresses liability only under respondeat superior, however, and does not discuss the direct liability of the company or the bill collector.

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society"; (3) causal connection between wrongdoer's conduct and victim's emotional distress; and (4) severe emotional distress. *Russo v. White,* 241 Va. 23, 26, 400 S.E.2d 160, 162 (*quoting Ruth v. Fletcher,* 237 Va. 366, 368, 377 S.E.2d 412, 413 (1989), *and citing Womack v. Eldridge,* 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974)). The Virginia Supreme Court has not created a bright-line test for severity, but has said that liability "arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo,* 241 Va. at 27, 400 S.E.2d at 163.

Claims of intentional infliction for emotional distress have survived motions for summary judgment in sexual harassment cases. *See, e.g., Speight v. Albano Cleaners, Inc.,* 21 F.Supp.2d 560 (E.D.Va.1998) (putting hand under employee's skirt and attempting to grab her buttocks, and separate attempt to grab her breast was sufficient outrageous conduct). However, all other precedents cited by the parties have involved denials of relief in these kinds of cases. *Dwyer v. Smith,* 867 F.2d 184, 194–195 (4th Cir.1989) (sexual comments, accusations of sexual relations with employees, and placing of pornography in plaintiff's mailbox not sufficiently outrageous); *Paroline v. Unisys Corp.,* 879 F.2d 100, 112 (4th Cir.1989) (supervisor's course of sexually suggestive remarks and touching, and one instance of groping in an automobile not sufficiently outrageous); *aff'd in part, rev'd in non-relevant part,* 900 F.2d 27 (4th Cir.1990); *Webb v. Baxter Healthcare Corp.,* 57 F.3d 1067, 1995 WL 352485 (4th Cir.1995) (unpublished), *opinion at* 1995 WL 352485 (4th Cir.1995) (gender- and ethnic-based ridicule of a sale representative concerning the weakness and unfitness of women in the workplace, unfair criticism and defamation concerning dress, tardiness, behavior with clients, and the plaintiff's sanity, as well as a comment that "You Jews are all alike" was not considered "utterly intolerable in a civilized society"); *Burke v. AT & T Technical Services Co., Inc.,* 55 F.Supp.2d 432, 441 (E.D.Va. 1999) (stating that the "great majority of discrimination cases...will not meet this demanding standard").

Claims for intentional infliction of emotional distress also usually fail because the harm alleged is not sufficiently severe. In *Russo,* it was not enough for the plaintiff to have plead that she "was nervous, could not sleep, experienced stress and 'its physical symptoms,' withdrew from activities, and was unable to concentrate at work." 400 S.E.2d at 163. In *Collins,* 2001 WL 589029 at *2–3, it was not enough for the plaintiff to have "experienced nightmares, sleeplessness, nervousness, inability to concentrate, fear and anxiety." In *Russo,* the Court suggested what degree of harm might prove the tort. "There is no claim, for example, that [plaintiff] had any objective injury caused by the stress, that she sought medical attention, that she was confined at home or in a hospital, or that she lost income." 400 S.E.2d at 163. In *Barrett,* 240 F.3d at 269, the court suggested that "interference with work or outside activities... [or] physical symptoms of stress" might be harms severe enough for plaintiff to prevail. In *Webb,* the Fourth Circuit assumed for purposes of argument that diagnoses of major depression, post traumatic stress disorder, and the need to take prescription drugs for sleeplessness and thyroid problems were sufficient allegations of harm. 1995 WL 352485 at *2–3.

 Given the evidence, I cannot find that Oppleman's behavior was outrageous enough to support a claim for intentional

infliction of emotional distress. In *Paroline*, the Fourth Circuit upheld summary judgment against plaintiff's emotional distress claim where the defendant, as here, engaged in a course mainly of sexually suggestive comments and touching of female employees. 879 F.2d at 102. The incident that sparked the lawsuit in *Paroline* was an incident in which the defendant, while driving plaintiff home during a snowstorm, kissed plaintiff and repeatedly attempted to hold her hand; he then insisted he enter her apartment, where he kissed her and rubbed his hands up and down her back despite her demands that he stop. While Oppleman's alleged behavior in this case is boorish, inappropriate, and actionable under Title VII, there is no allegation in this case of equivalent molesting behavior. Certainly there is no evidence of behavior falling to the level which the court in *Speight* held supported a emotional distress claim.

The harm which Ms. Glover suffered, while unfortunate and compensable under Title VII, is simply not severe enough to support her emotional distress claim. Her injuries (sleeplessness, fatigue, anxiety, loss of enjoyment) are clearly of the quality rejected as insufficiently severe in *Russo, Barrett,* and *Collins.* While she certainly has suffered emotional pain, she does not maintain that she has suffered any more physical symptoms on account of her anxiety and depression. Though she has been treated with medication for anxiety and depression, her diagnoses have not been as severe as the major depression, post-traumatic stress disorder, and thyroid problems suffered by the plaintiff in *Webb.* The fact that she has sought and attained successful employment in a similar position at another hotel also suggests that her injuries were relatively short-lived. And while expert evidence does not appear to be required to prove an emotional distress

claim under Virginia law, Glover has not come forward with any expert opinion that might lead me to view the facts otherwise. Accordingly, I will grant the Hotel's motion with respect to Count V.

### 4. The evidence would not permit a finding of negligent retention.

Virginia recognizes an independent tort of negligent retention. *Southeast Apartments Management, Inc. v. Jackman,* 257 Va. 256, 513 S.E.2d 395, 397 (1999). According to the Supreme Court of Virginia, the "cause of action is based upon the principle that an employer . . . is subject to liability of harm resulting from the employer's negligence in retaining a dangerous employee who the employer knew or should have known was dangerous and likely to harm others." *Id.* Courts applying Virginia law have recognized that an employer can negligently retain a sexual harasser. *Call v. Shaw Jewelers, Inc.,* No. 3:98CV449, 1999 U.S. Dist. LEXIS 636 (W.D.Va. Jan. 7, 1999), *aff'd,* 2000 WL 429710 (4th Cir. Apr.21, 2000); *Sutphin v. United American Insurance Co.,* 154 F.Supp.2d 906 (unpublished), *opinion at* 2000 WL 33403207 (W.D.Va.2000).

Here, the plaintiff's negligent retention case must rely entirely on notice of the *Cinquemani* and *Neighbors* lawsuits, which were settled three to four years prior to the events alleged in this case, and which were based upon alleged behavior by Oppleman occurring six to eight years prior to the events at issue here. For reasons set forth previously, this evidence is stricken from the record viewed on motion for summary judgment. The plaintiff has not presented any evidence showing that similar action by Oppleman has been brought to the notice of the partnership between the time of those lawsuits and the case at hand. Therefore, the plaintiff's

negligent retention claim must fail for lack of admissible evidence.

 As an alternate basis for granting summary judgment for the defendants, I have strong doubts whether this tort applies to business organizations in which the tortfeasor is the only person who has power not to retain the tortfeasor. In this case, Oppleman is the sole general manager of the Seven Hills partnership and the only person who can remove himself as manager of the Hotel, short of the partnership dissolving. As the Virginia Supreme Court explained in *Jackman*, the tort of negligent retention is a mechanism for imputing liability to an employer who conducts business through a dangerous employee. In this case, however, there is no policy need to resort to this legal mechanism to "get to" the employer. Because Oppleman is the chief executive of the partnership, the Hotel is already liable for any hostile environment he maintained there. Furthermore, to hold that the sole general manager of a partnership can be held liable for not firing himself would open the door to negligent retention claims against sole proprietors who manage their businesses' daily affairs themselves instead hiring outside managers.[4]

The court holds that the Defendants' Motion for Summary Judgment is is **DE-NIED** with respect to Count I (hostile work environment under Title VII). Summary Judgment is **GRANTED** with respect to Counts II and III of the Amended Complaint (quid pro quo harassment and termination and retaliation), Count V (intentional infliction of emotional distress), and Count VI (negligent retention). Sum-

mary judgment is **GRANTED IN PART** with respect to Count IV to the extent that it pleads an assault claim, and **DENIED IN PART** to the extent that it pleads battery. The Defendants' Motion in Limine to Exclude All Evidence Related to the Lawsuits Filed by Carolyn Neighbors and Elinor Heston Pierce Cinquemani is **GRANTED** as to evidence in chief. Defendants' Motion to Strike and Motion in Limine to Exclude Evidence is **GRANTED IN PART** and **DENIED IN PART** consistent with this Opinion.

An appropriate order shall issue.

---

4. In holding against the plaintiff on this count I am not countenancing the Hotel's argument that the Revised Uniform Limited Partnership Act, Va.Code § 50–73.1 et seq., shields a limited partnership from liability for the torts of its general partner. Va.Code § 50–73.73 only protects the limited *partners* from personal liability for such torts; it does not immunize the *partnership* and its assets. Nor is my holding premised upon a notion that the plaintiff chose a redundant or unnecessary remedy in bringing this claim.